BURTON-JONES DEVELOPMENT, INC., *v.* FLAKE.

1. EVIDENCE—COMMON KNOWLEDGE—DEVELOPMENT OF SUBDIVISIONS.
   It is a matter of common knowledge that parties interested in the development of subdivisions generally recognize the necessity of providing for improvements therein such as the installation of storm sewers so as to permit streets to be blacktopped.

2. COVENANTS—RUNNING WITH THE LAND.
   A duly recorded agreement and declaration of restrictions whereby purchasers of lots in platted subdivision agreed to share proportionately with all other property owners the cost of improvements therein agreed to by the owners of a majority of the lots in the subdivision was properly held to be a covenant running with the land.

3. SAME — CONSTRUCTION — IMPROVEMENTS IN SUBDIVISION — AMBIGUITY.
   Covenant whereby purchasers of lots in a platted subdivision agreed to share proportionately with all other property owners the cost of improvements therein agreed to by the owners of a majority of the lots in the subdivision *held*, not ambiguous because of failure to specify the nature, extent, location and cost of the proposed improvements.

---

REFERENCES FOR POINTS IN HEADNOTES
[2] 14 Am Jur, Covenants, Conditions, and Restrictions §§ 20, 29.

4. SAME—IMPROVEMENTS—APPROVAL BY LOT OWNERS OF SUBDIVISION.
Purchasers of lots in newly-platted subdivision were subject to
enforcement of covenant requiring them to share proportion-
ately with all other property owners the cost of improvements
therein agreed to by the owners of a majority of the lots in
the subdivision notwithstanding no meeting was held by which
a vote was taken, where it is undisputed that the owners of a
majority of the lots had agreed to construction of a storm
sewer preparatory to blacktopping the streets, the sewer was
constructed without objection by defendant lot owners, and
no claim is made that they were misled or deceived, or that
the amount allocated as their share, based on street frontage,
was not a proper amount.

5. SAME—PUBLIC POLICY—STORM SEWERS.
The construction of storm sewers preparatory to blacktopping
of streets in a newly-platted subdivision, in accordance with
duly-recorded covenant of which lot purchasers were charged
with notice and which subjected them to payment of proportion-
ate share of cost of improvements in the subdivision agreed to
by the owners of a majority of the lots therein, may not be
said to render such a covenant against public policy so as to
render the covenant unenforceable after the construction has
been completed; such projects not being against public policy.

6. SAME—STORM SEWERS—APPROVAL OF DRAIN COMMISSIONER.
Whether or not the drain commissioner of county adjoining that
in which land was located, but which land was in an intercounty
drainage district involving both counties, should have approved
the construction of a storm sewer prior to blacktopping of
streets in newly-platted subdivision is not open to consideration
in suit to enforce covenant, running with the land, against
purchasers of lots, which required them to pay their propor-
tionate share of the cost of improvements in the subdivision,
especially where drain commissioner of county where land is
located had approved the project.

7. SAME—RUNNING WITH THE LAND—COST OF IMPROVEMENTS.
Affirmative and enforceable covenants to pay part of the cost
of making improvements can be created to run with the land.

SOURIS and ADAMS, JJ., dissenting.

Appeal from Eaton; McDonald (Archie D.), J.
Submitted April 4, 1962. (Docket No. 13, Calendar
No. 48,844.) Decided October 1, 1962.

Amended bill by Burton-Jones Development, Inc., a Michigan corporation, against Fred C. Flake and others to secure money damages and establish liens on subdivision lots for improvements made under recorded agreement. Decree for plaintiff. Defendants appeal. Affirmed.

*Fraser, Trebilcock, Davis & Foster,* for plaintiff.

*Marshall, O'Brien & Fischer (John P. O'Brien,* of counsel), for defendants.

CARR, C. J. In the latter part of 1954 the owners of certain lands in Delta township, Eaton county, subdivided and platted the property, which is referred to in the record before us as Huntington Acres Subdivisions Nos. 1, 2, and 3. In connection with the proceeding a so-called agreement and declaration of restrictions was prepared by said owners, duly executed, and recorded in the office of the register of deeds of the county. Among other provisions was the following:

"A purchaser of any lot in Huntington Acres Subdivision No. 1, No. 2, or No. 3 agrees by such purchase for himself, his heirs and assigns to share proportionately with all other property owners in the cost of any improvements in his respective subdivision agreed to by the owners of a majority of the lots in his respective subdivision. For the purpose of voting on any proposed improvements, the holders of executory land contracts while in possession of said property shall be deemed to be the owners of said lot and entitled to cast the vote to which the lot is entitled. In other instances the holder of the record title shall be entitled to cast the vote of the lot."

The plaintiff herein, Burton-Jones Development, Inc., was organized in 1957 for the purpose, among others, of developing Huntington Acres subdivisions.

Its president was Leland R. McElmurry who was the owner of 50% of the issued stock of the corporation. At the time McElmurry owned 27 of the 45 lots contained in Huntington Acres Subdivision No. 1. It was his desire as the owner of a majority of the lots to cause improvements to be made therein involving the installation of storm sewers in certain streets so as to permit said thoroughfares to be "blacktopped." The record before us discloses that the improvement by blacktopping said streets necessitated drainage.

Representatives of McElmurry contacted other lot owners in Huntington Acres Subdivision No. 1, discussing the matter of blacktopping certain streets and the necessity for a storm sewer in connection therewith. Some lot owners favored the project and agreed to share the costs of the storm sewer, while others were unwilling to do so. It does not appear that any formal meeting of lot owners was held. The owner of the majority of the lots in the subdivision, McElmurry, decided that storm sewers should be installed. To that end the subdivision developer, plaintiff herein, entered into a construction contract with the Millett Excavating Company by which the work was undertaken and completed in June, 1957, at a total cost of $48,087.78.

The drainage tile were placed in the center of dedicated streets on which the lots owned by defendants and appellants herein fronted. It is conceded that installation of storm sewers in Huntington Acres Subdivision No. 3 did not increase the cost of the project attributable to Huntington Acres Subdivision No. 1. The amount of the cost attributable to lots owned by McElmurry was paid by him. No claim is made that the total cost of the project was unreasonable, nor that the method of prorating the expense of the improvement was not proper. It further appears from the agreed statement of facts that the project was approved by the Eaton county drain

commissioner, and that payment of the total cost was made by plaintiff.

Demand was made upon appellants herein for payment of their prorated shares of the project based on a front foot apportionment of the total cost. Suit in equity was instituted against defendants Flake, which was later transferred to the law side of the court. Defendants filed answer and motion to dismiss, which motion was denied. Subsequently, following a pretrial hearing, the parties agreed that the action based on the covenant in the recorded declaration of restrictions, above quoted, should be tried in equity. In consequence, under date of December 10, 1959, plaintiff filed an amended bill of complaint joining as defendants other lot owners who had refused to make payment of their alleged shares of the cost of the improvement on demand therefor. Such joinder was in accordance with the order of the court denying the motion to dismiss and directing that plaintiff's cause of action, insofar as based on the covenant, should be determined in equity.

Defendants filed answer to the amended bill of complaint denying the right of plaintiff to recover and challenging the propriety of the action taken. By way of affirmative defense it was alleged that the covenant could not be enforced because it was vague, indefinite, and ambiguous, that no meeting of lot owners was held for the purpose of voting on the matter, that the covenant lacked mutuality, and that it did not pertain to improvements of the character here involved. It was further claimed on behalf of defendants that the storm sewers should have been installed by the Eaton county drain commissioner.

The controversy came to hearing before the circuit judge and proofs were offered by the respective parties. The circuit court reporter died before he had transcribed his notes of the testimony, and apparently it was impossible for the parties to procure

a transcript to be made by another reporter. In consequence, the factual questions, so far as such are involved in the case, have been incorporated in a statement of facts on which the parties are agreed except as to any reference or references being made to the Ingham county drain commissioner during the course of the proceedings. Counsel for defendants thought that such reference had been incorporated in their motion to dismiss which, presumably, was made orally in open court, but counsel for plaintiff disagreed. Notes made by the trial judge in the course of the proceeding failed to indicate that anything was said at any time with reference to a possible interest on the part of the Ingham county commissioner. As before noted, the subdivisions were located entirely in Eaton county. However, an intercounty drainage district had been established at a prior time, and the lands in question were within the boundaries of that district.

At the conclusion of the proofs defendants renewed their previous motion to dismiss. Said motion was denied, and decree entered for the plaintiff sustaining the validity of the covenant contained in the agreement and declaration of restrictions as executed and recorded by the owners of the property in 1954. It was expressly found also that the cost of the improvement was reasonable, that it had been paid in full by plaintiff corporation, and that plaintiff was entitled to recover from the defendants the amounts apportioned on a frontage basis to their respective lots. It may be noted in this connection that the said agreement as made by the owners of the property declared that the provisions set forth therein should bind the land and that enforcement should be by means of an action in the circuit court of Eaton county in chancery. The decree provided also that the trial court would retain continuing jurisdiction to enforce liens for the charges made on the respective

lots of defendants in the event that amounts found due were not paid. From the decree entered defendants have appealed, raising the following 3 questions:

"1. Is this covenant unenforceable because of ambiguity?

"2. Does this covenant authorize the majority owner of the lots *ex parte* to 'vote' to install a drain in a public highway without a noticed meeting and opportunity to be heard?

"3. If the covenant be construed as an agreement between the property owners to construct a drain in a public highway, is the agreement void because it violates public policy?"

Appellants' argument that the covenant on which plaintiff's cause of action is based was and is unenforceable because of ambiguity is apparently based primarily on the claim that the covenant does not specify the "nature, extent, location and cost" of proposed improvements. It may be inferred that at the time the agreement and declaration of restrictions was executed by the owners of the property in 1954 they contemplated the necessity for improvements that would benefit the Huntington Acres subdivisions and promote their development in the future. That improvement of the streets traversing the property would have such a result is a logical conclusion, and we are concerned in this case with a project of that nature. It is, we think, a matter of common knowledge that parties interested in the development of subdivisions generally recognize the necessity of providing for improvements of the character here in question.

Primarily we are not dealing with a matter of drainage but, rather, of the installation of storm sewers to take care of surface water to the end that dedicated streets might be blacktopped. Viewed from a realistic standpoint the project which was

accomplished under the contract made by plaintiff had for its ultimate object the improvement of the streets. It is significant that no attempt was made by anyone to prevent the carrying out of the contract. No claim is made that defendants were not fully advised with reference to the contemplated proceeding or that they were misled or deceived in any respect. However, they elected to wait until the work was done and paid for, and then denied their liability to contribute to the cost in accordance with the covenant notwithstanding that they had acquired their lots in Huntington Acres Subdivision No. 1 "subsequent and subject to the aforesaid covenant," as appears in the agreed statement of facts.

We cannot agree with appellants' claim that the covenant, which the trial judge properly held to run with the land, was or is ambiguous as applied in the instant case. Street improvements by subdividers in newly-platted property is common in practice. Provision for meeting payment of obligations so incurred is doubtless desirable. No claim is here made on behalf of any of the defendants that the existence of the covenant subject to which they made their respective purchases was not known to them. They could scarcely have failed to realize that the owner or owners of a majority of the lots in any of the subdivisions could bring about the making of an improvement that would operate to the benefit of all property therein.

It will be noted that the covenant pursuant to which plaintiff claims the right to recover did not provide for a meeting of the lot owners for the purpose of discussing the desirability of a proposed improvement. It appears from the statement of facts that representatives of the plaintiff and of the owner of a majority of lots in subdivision No. 1 discussed the matter here involved with lot owners, some of whom approved the project and indicated their

intention to pay their proportion of the cost. A formal meeting and the casting of votes thereat was not requisite to the proceeding, nor could it in any conceivable way have affected the result. Appellants were charged with notice of their rights and obligations when they purchased their lots, and their possible failure to give due consideration to probable future action cannot be made the basis of equitable relief.

We see nothing in the covenant here involved that may fairly be said to violate any recognized rule of public policy. As before pointed out, the installation of storm sewers for the disposal of surface water preceding the blacktopping of the streets in question was not primarily a drainage project instituted for the protection of the public health. The making of improvements of such character is not only beneficial to adjoining property owners but carries with it also a benefit to the traveling public generally. Such projects, as ordinarily carried on in new subdivisions, may not be said to be against public policy.

Appellants assert in effect that the drain commissioner of the county, or perhaps of the 2 counties, Eaton and Ingham, should have installed the storm sewers to prepare the streets in the subdivision for blacktopping. It appears affirmatively in the record that the drain commissioner of Eaton county approved the project here involved. It may not be assumed that the Ingham commissioner would have done otherwise had he been consulted. In any event, no one is asserting on behalf of the public generally that the project as carried out under the contract made by plaintiff was detrimental to the public or violated any rule of public policy. We think the principle recognized in *Kiley* v. *Bond,* 114 Mich 447, cited by the trial judge in his opinion, is applicable here. It was there held:

"The question whether the highway officers should be made parties to a proceeding to deepen and widen a drain located within the limits of a highway is not open to consideration in a suit by adjacent land owners to enjoin the prosecution of the work." (Syllabus 2.)

Counsel for plaintiff have called attention to decisions from other States involving issues of the character raised by appellants herein. In *Neponsit Property Owners' Association, Inc.,* v. *Emigrant Industrial Savings Bank,* 278 NY 248 (15 NE2d 793, 118 ALR 973), rehearing denied 278 NY 704 (16 NE2d 852), the plaintiff, being the owner of a tract of land, proceeded to develop it as a residential community and to convey lots to purchasers, said lots being described by reference to a filed map and to roads and streets shown thereon. Involved in the case was a covenant contained in the deeds to the purchasers of lots, providing that the property described should be subject to an annual charge in an amount fixed by the grantor or its successors and assigns, not exceeding, however, $4 per lot 20 x 100 feet. The amount so paid was required to be devoted to the maintenance of the "roads, paths, parks, beach, sewers, and such other public purposes as shall from time to time be determined by the party of the first part, its successors or assigns." The covenant further granted the right to bring action to recover the charge so imposed and to enforce a lien therefor. In sustaining the right of recovery the court held that the covenant was one running with the land, saying in part after a discussion of prior decisions (pp 259, 260):

"Looking at the problem presented in this case from the same point of view and stressing the intent and substantial effect of the covenant rather than its form, it seems clear that the covenant may properly be said to touch and concern the land of the defendant and its burden should run with the land. True, it

calls for payment of a sum of money to be expended for 'public purposes' upon land other than the land conveyed by Neponsit Realty Company to plaintiff's predecessor in title. By that conveyance the grantee, however, obtained not only title to particular lots, but an easement or right of common enjoyment with other property owners in roads, beaches, public parks or spaces and improvements in the same tract. For full enjoyment in common by the defendant and other property owners of these easements or rights, the roads and public places must be maintained. In order that the burden of maintaining public improvements should rest upon the land benefited by the improvements, the grantor exacted from the grantee of the land with its appurtenant easement or right of enjoyment a covenant that the burden of paying the cost should be inseparably attached to the land which enjoys the benefit. It is plain that any distinction or definition which would exclude such a covenant from the classification of covenants which 'touch' or 'concern' the land would be based on form and not on substance."

An interesting case presenting a situation analogous in some respects to that in the controversy at bar is *Stephens Company* v. *Lisk,* 240 NC 289 (82 SE2d 99). The plaintiff in that case developed a tract of land referred to as Myers Park. Lots owned by the principal defendant were conveyed by the plaintiff by deeds containing a provision that if the grantor decided to grade, pave, or otherwise improve streets or sidewalks in or adjacent to block 80 in which defendant's property was located, or to put in water or sewer lines or other improvements, the property conveyed should bear its part of the cost thereof on a frontage basis. It was specifically declared that such covenant should run with the land. In the spring of 1950 the plaintiff caused a certain street along block 80 to be graded and paved, and provided with water and sewer lines. Plaintiff made

the improvement without consulting with or obtaining prior consent of the lot owners. The proportion of the cost chargeable against defendant's property on a frontage basis was $513.79. Action was brought to recover such amount, reliance being placed on the covenant in question. The covenant was sustained and the court construed it as vesting in the grantor authority to cause the improvement to be made without reference to consent on the part of lot owners. It was held that the covenant was of such character as to run with the land. After disposing of the question of construction, the court commented (p 296):

"Finally, it is not amiss to observe that the findings of fact fail to show (1) that defendants made any complaint when the Stephens Company was making the improvements, or (2) that the amount of cost of the improvement sought to be recovered in this action is not the part of the cost allocable to the lots of defendants in accordance with the provisions of the covenant. Indeed it is agreed that it is the amount. Therefore no injustice appears."

The language quoted may well be applied to the situation in the case at bar. As before noted, defendants herein did not undertake to prevent the making of the improvement in the street adjacent to their property, and it is also conceded that the cost of the project was not excessive.

In accord with the above decisions is the holding of the supreme court of Mississippi in *Mendrop* v. *Harrell*, 233 Miss 679 (103 So 2d 418, 68 ALR 2d 1013). There the covenant involved in the litigation, on the basis of which plaintiffs sought to recover costs of a street improvement, read as follows (p 684):

"7. It is further understood and agreed that said Henry W. Harrell and his successors in title agree to bear all the expense required of them incidental to any street or sidewalk paving that may be done

in the future, adjacent to the property owned by said Henry W. Harrell, described in this instrument.

"8. These covenants are to run with the land, and shall be binding on all parties and all persons claiming under them for a period of 25 years from the date these covenants and agreements are recorded, after which time said covenants shall be automatically extended for successive periods of 10 years unless an instrument signed by a majority of lot owners in Sylvan Flats Subdivision (and any additions thereto) has been recorded agreeing to change said covenants in whole or in part.

"9. Enforcement shall be by proceeding at law in equity against any person or persons violating or attempting to violate any agreement, either to restrain violation or to recover damages."

All deeds of the lots in the subdivision involved in the case contained like provisions. After plaintiffs purchased the land in 1953 they installed water lines, curbs, gutters, and paved streets. Such improvements were made to enable purchasers of lots to obtain loans insured by the Federal housing administration and the veterans administration. A like consideration was involved in the instant case. Defendant Harrell paid the paving costs on 4 lots but subsequently refused to reimburse for the cost of paving a street in front of 2 other lots that he had acquired. Thereupon plaintiffs filed actions to recover as to each of said lots, which cases were consolidated for trial. As in other cases of similar nature, the court held that the covenant ran with the land. In summarizing such conclusion it was said (p 690):

"In brief, the covenant in the 1955 deed from Mendrop and Gay to Harrell is a valid, affirmative covenant running with the land, by which the land is burdened with an obligation to pay the expenses incidental to street paving which might be done. It is so related to the land as to enhance its value and

confer a benefit upon it. It is also beneficial to the property and lots in the subdivision owned by appellants and by other property owners therein.

"Moreover, we think that a fair construction of the covenant, in the light of the facts and circumstances existing at the time of its execution, and according to its terminology, show that the parties intended that the covenant include the expense or costs of the construction of street paving, and also curbs and gutters. The provision expressly refers to expenses 'incidental to any street or sidewalk paving that may be done in the future, adjacent to the property.' "

Citing among other authorities *Neponsit Property Owners' Association, Inc.,* v. *Emigrant Industrial Savings Bank, supra,* the court concluded (p 689) that "covenants to pay part of the cost of making or maintaining general improvements can be created to run with the land." In accordance with its conclusions judgment was rendered in favor of the plaintiffs.

We conclude that the trial judge correctly determined the issues presented on the record before him. The decree entered is affirmed, with costs to appellee.

Dethmers, Kelly, Black, Kavanagh, and Otis M. Smith, JJ., concurred with Carr, C. J.

Adams, J. (*dissenting*). This case involves an agreement and declaration of restrictions entered into on November 1, 1954, by all of the owners of certain acreage in Eaton county. The agreement is an elaborate one. Tucked away at the back of it is a section entitled "other restrictions" which prohibits Carolina or Lombardy poplar trees, the moving of buildings, regulates the rebuilding of buildings destroyed by fire, and forbids crops except kitchen gardens. In the second paragraph of this section the following provision appears:

"A purchaser of any lot in Huntington Acres Subdivisions No. 1, No. 2, or No. 3 agrees by such purchase for himself, his heirs and assigns to share proportionately with all other property owners in the cost of any improvements in his respective subdivision agreed to by the owners of a majority of the lots in his respective subdivision. For the purpose of voting on any proposed improvements, the holders of executory land contracts while in possession of said property shall be deemed to be the owners of said lot and entitled to cast the vote to which the lot is entitled. In other instances the holder of the record title shall be entitled to cast the vote of the lot."

The agreement further provides that the restrictions, stipulations, and conditions need not be incorporated in any subsequent deed but shall be deemed incorporated therein.

The facts with regard to the proceedings under the above paragraph are set forth in the opinion of Mr. Chief Justice CARR and need not be repeated here. However, it should be emphasized that even under the inadequate record available to this Court, it is clear that when it was proposed to construct the storm sewer in question, though some property owners were informally contacted, "Some of said owners were not able to be contacted for 1 reason or another."

The courts have long recognized and upheld covenants imposing burdens upon land. The earlier and more familiar types dealt with party walls and line fences. Such a party-wall agreement was held to be enforceable by a subsequent owner of the land on which the party wall was constructed but not by the assignee of the person who originally built the party wall in *Adams* v. *Noble,* 120 Mich 545. In that case, this Court clearly held that such an agreement can run with the land and that the rights and lia-

bilities thereunder accrue to subsequent owners of the real property.

To this extent, then, the present agreement presents no problem and, under the holdings of this Court, can be determined to run with the land. Its meaning and construction, however, present a question to which I would give a different answer than that proposed by Mr. Chief Justice CARR.

The appellee has cited several cases where specific covenants were held to impose a burden that runs with the land and binds subsequent property owners. *Neponsit Property Owners' Association, Inc.,* v. *Emigrant Industrial Savings Bank* (1938), 278 NY 248 (15 NE2d 793, 118 ALR 973), rehearing denied 278 NY 704 (16 NE2d 852), wherein a charge of $4 per lot was imposed for the maintenance of "roads, paths, parks, beach, sewers, and such other public purposes as shall from time to time be determined by the party of the first part, its successors or assigns": *Mueller* v. *Bankers Trust Co. of Muskegon,* 262 Mich 53, wherein an agreement to build a bridge across a creek was upheld as a covenant essential to the enjoyment and use of the properties to be served by the bridge; *Stephens Co.* v. *Lisk* (1954), 240 NC 289 (82 SE2d 99), upheld a covenant that permitted the subdivider to make improvements at a cost per front foot; *Mendrop* v. *Harrell* (1958), 233 Miss 679 (103 So2d 418, 68 ALR2d 1013), imposed liability on a lot owner under a covenant which provided, "It is further understood and agreed that said Henry W. Harrell and his successors in title agree to bear all the expense required of them incidental to any street or sidewalk paving that may be done in the future."

In all of these cases, the provisions for improvements are much more specific than the provision here under consideration. In none of these cases was there any mention of voting by the lot owners or agreement by a majority of them. Here we have

a sweeping agreement ‘ for "any improvements."
With such a broad agreement, the safeguard which
evidently was intended was that before an improve-
ment was undertaken, it would be voted upon by the
lot owners.   The procedure contemplated, if not
fully expressed in the agreement, would be similar
to that followed in making public improvements
whereby an opportunity is given the property owners
to be heard before the proposal is undertaken.

Had such a procedure been followed here, no one
could complain.  All of the lot owners would have
been given an opportunity to examine the proposal
or possible alternatives.  For example, it is sug-
gested that a public, 2-county drain known as the
Banks Drain, a public corporation, had already been
established by law to provide a drain for the prop-
erty in question.  It is suggested that by proper peti-
tion, a drain might have been installed and the cost
allocated over the entire Banks Drainage District at
less expense to each lot owner.   Those property
owners who had no notice whatsoever of the project
had no opportunity to present this alternative which
might or might not have been a feasible one.

Because the defendants were not notified of the
proposed improvement, were not afforded an oppor-
tunity to consider the same or to propose alterna-
tives, and were not afforded an opportunity, however
informal, to vote, the decree for the plaintiff should
be vacated.

There is a second reason why the decree of the
circuit court should not be allowed to stand.   The
storm sewer was in the nature of a public improve-
ment.  As a matter of public policy it is not neces-
sary that all public improvements be made by public
authorities.  But, if such public improvements are
to be carried out, as they were in this case, by private
parties, the burden of showing clearly and un-
equivocably that such improvements were made with

the approval of and under the supervision of the proper public authorities should be upon those executing the projects.

In the present case the area in question was under the supervision of the Eaton and Ingham county drain commissioners. It appears that the Ingham county drain commissioner was not consulted. Certainly no approval by him appears in the record. As to the Eaton county drain commissioner, all that appears is the following:

"Clare Hodeman, engineer for the Eaton county road commission testified at length as to the manner in which the highway and sewers were put in, which was to the effect that it was done satisfactorily.

"Ray C. Smith, Eaton county drain commissioner, testified to the same effect, namely, that the sewers were put in in a manner satisfactory to the county drain commission."

Official approval by the proper authorities should be fully established before these defendants are required to pay for an improvement that was constructed upon a public road. In the absence of such approval, the improvement could be canceled out by those same authorities at any time, a new one made and these defendants compelled to pay for both.

I would reverse the decree of the circuit judge and dismiss the bill of complaint with prejudice.

Souris, J., concurred with Adams, J.